2025 UT App 34

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
GREGORY JOSEPH COVER,
Appellant.

Opinion
No. 20230018-CA
Filed March 6, 2025

Third District Court, Silver Summit Department
The Honorable Richard E. Mrazik
No. 201500240

Nicolas C. Wilde, Attorney for Appellant

Derek E. Brown and Marian Decker,
Attorneys for Appellee

JUDGE DAVID N. MORTENSEN authored this Opinion, in which
JUDGES GREGORY K. ORME and RYAN M. HARRIS concurred.

MORTENSEN, Judge:

¶1 Gregory Joseph Cover was convicted of child abuse for burning the hand of one of his sons on a hot metal door and causing bruises to the leg of his other son by shooting him with an airsoft pistol. The burning conviction was later dismissed as time-barred, but Cover appeals the airsoft conviction, arguing his defense counsel was ineffective for approving jury instructions that failed to address the defense of reasonable discipline in a number of ways. We disagree with Cover and affirm his conviction.

BACKGROUND

¶2      Cover and his wife, Ellie, lived with their two sons, Jared and Cade, in Kamas, Utah.[1] When police came to the home to investigate a separate incident, they noticed a hole in the boys' bedroom wall and asked Jared how it got there. Jared's response led to police questioning Ellie about Cover's abuse.

*Allegations of Abuse*

¶3      Ellie informed the police that one evening in October 2018 she heard Cover yelling at the boys after they had gone to bed. While Ellie did not witness Cover pushing Jared's head into the wall, she noticed a hole in the wall above Jared's bed the next morning and photographed it. Jared later recounted that Cover had been swearing and yelling before pushing his head into the wall, breaking through the drywall. Jared said Cover "just grabbed the full side of [his] head" and "just put it in the wall." Jared experienced pain and dizziness, along with the development of a large bump on the side of his head, which persisted for four to five days.

¶4      Also in October 2018, Cover and Ellie got into an argument while they were in their vehicle after the boys got out to open and close a gate to their property. During this conversation, and while the boys were out of the vehicle, Ellie told Cover that she wanted to leave him. As Ellie recounted the incident, Cover then "reached over and put his left hand on [Ellie's] throat and strangled" her,

1. "On appeal," we normally "review the record facts in a light most favorable to the jury's verdict and recite the facts accordingly." *State v. Holgate*, 2000 UT 74, ¶ 2, 10 P.3d 346 (cleaned up). But here, because of the mixed verdict and for narrative purposes, we recite the allegations of abuse—even those for which Cover was ultimately acquitted—from the perspective of Ellie and Jared. We employ pseudonyms for Cover's wife and his two sons.

threatening, "If you ever try and take my kids away, I'll f'ing kill you." Ellie recalled being scared and having bruises from the incident.

¶5     Another incident occurred in December 2018 when Cover, Ellie, and the boys returned home to find that an exterior metal door to the basement had blown open and was resting against a propane heater. On investigation, it was determined that Jared hadn't properly closed the door earlier in the day. Ellie said Cover began "yelling" at Jared and "telling him he needed to pay attention." Jared testified that Cover was "angry" and "upset" and that he "grabbed" him by the wrist and held his hand against the door for ten or fifteen seconds. This action resulted in a burn on Jared's hand. Jared's hand blistered and began peeling around his knuckles, leaving his skin badly damaged; Ellie and Jared later described the injury as a "pretty bad burn," noting that the skin was bright red before peeling off in the following days. Ellie, who worked in a doctor's office, was able to get a topical ointment to treat the burn. But she did not seek medical treatment "out of fear of people knowing what was going on in [their] house" and "because of what [Cover] would do" to the boys or her. It took about two months for the wound to heal.

¶6     In February 2020, Cade received an airsoft pistol for his birthday. One day shortly thereafter, Cover was chasing the boys through the living room and pointing the airsoft pistol at them. At some point, the boys got scared, Cade began crying, and the boys began to run away from Cover. Jared said that Cade ran into the basement to find a place to hide but that Cover "cornered him in and shot him" in his calves from about six or seven feet away. Despite Cade crying and pleading for Cover to stop, Jared said Cover was "still having fun" and told Cade to stop crying. Ellie later noticed welts on Cade's leg. Ellie recalled Cade saying that his "leg hurt[] so bad" and that Cover "shot [him] with the airsoft gun." The pellets left three bruises, each about one inch in

diameter, that turned blue and purple. Ellie said that the welts took about a week or two to heal.

¶7     The final incident relevant here occurred in April 2020, when one of the family dogs bit one of the family's baby goats.[2] Cover became enraged, swearing and yelling at the boys for about ten minutes. He grabbed Jared by the collar and threw him over the fence to retrieve the baby goat. When Jared returned with the goat, Cover grabbed him by the collar, "balled up his fist," pulled back few inches, and hit Jared "in the forehead." Jared said Cover also struck Cade in the same way. Ellie recalled that Cover had told the boys when this happened that they needed "to pay attention" and not "let the dogs get by the baby goats." She also said the boys "were scared" but that "they would just suck it up" to appease Cover's anger. She explained that if they cried, he would get angry, saying something like, "Do you want me to give you a reason to cry?"

*Criminal Prosecution*

¶8     Cover was charged with the following crimes: (1) child abuse for burning Jared's hand, (2) child abuse for shooting Cade with an airsoft pistol, (3) child abuse for hitting Jared's head during the baby goat incident, (4) child abuse for hitting Cade's head during the baby goat incident, (5) child abuse for pushing Jared's head into the wall, (6) threat of violence for threatening to kill Ellie, and (7) assault for grabbing Ellie's throat. The case ultimately went to trial.

¶9     Ellie and Jared testified during the trial consistent with the narrative as summarized above. During cross-examination about the airsoft pistol incident, Ellie acknowledged initially telling the police that Cover was "just messing around," but she also said she saw Cover chasing the boys and heard the airsoft pistol discharge.

---

2. While not his primary profession, Cover also raised goats as a business.

She also emphasized that Cade "was scared and crying and running away" from Cover during the incident. Ellie also testified on cross-examination that she observed Cover striking the boys on the forehead during the goat incident with enough force to push their heads back, though the incident left no marks. She further stated that she did not report the incident until June 2020. Ellie also testified that while she did not witness the events that led to the hole in the wall or the burn on Jared's hand, her knowledge of those events came from Jared's recounting. But she added that when she confronted Cover about the burn, he defended his actions by claiming that he "didn't know it would be that bad" and that he "didn't realize the door was that hot." Ellie further testified on cross-examination that she and Jared had, at times, not a "been completely truthful, out of fear" of Cover. For example, Ellie admitted that Jared once reported that he had been kidnapped when in fact he had attempted to run away from home to get away from Cover.

¶10　During cross-examination, Jared admitted that during the preliminary hearing, he had testified that Cover hit him in the face during the goat incident rather than on the forehead, but he explained, "My forehead is part of my face, so yes." He also acknowledged telling an officer during a June 2020 interview that he was six or seven years old when Cover burned his hand on the metal door. However, at trial, Jared testified that he would have actually been twelve or thirteen years old at the time.[3] Jared further testified on cross-examination that in one of the interviews during the police investigation, when asked by an officer if there

---

3. On redirect examination, the prosecutor asked Jared if he remembered why he had stated he was seven years old when Cover burned his hand. Jared responded that he was unsure, explaining, "[W]e didn't even live in Kamas when I was seven. But I don't know. I just got out of an abusive household, and I could have forgotten some stuff. I don't know. . . . I don't know why I said it."

was anything he wanted to share about the incident that prompted the initial contact with the police, he had lied when he first told the story about the incident because he "didn't want to get in trouble." Jared also admitted to lying about being kidnapped when he was ten or eleven and had tried to run away.

¶11 After the State rested, Cover moved for a directed verdict on count 1 (the hand burning incident). Defense counsel (Counsel) argued that Jared had provided conflicting testimony, stating the incident occurred both when he was twelve and when he was seven or eight. Counsel contended that if the incident occurred when Jared was seven or eight, it would fall outside the statute of limitations and should not be submitted to the jury. Counsel also moved for a directed verdict on count 2 (the airsoft pistol incident), arguing that the evidence indicated Cover was simply "messing around" and lacked the necessary criminal intent.[4] The district court denied the directed verdict motions, ruling that there was sufficient evidence for a jury to potentially convict.

¶12 Cover then testified in his own defense, denying all the allegations against him. He acknowledged that Jared burned his hand on the hot metal door, but he denied holding his hand to it. Cover also denied hitting the boys in the head or face, stating that he only "flicked" them on the forehead and the back of the head to get them to "pay attention." He also denied pushing Jared's head into the bedroom wall, claiming instead that Jared tripped and fell into the wall when Cover tried to get him to go to bed. Furthermore, Cover denied ever grabbing Ellie by the neck or threatening to kill her. He stated that Ellie actually started the argument and "slapped [his] face with her knuckles." He testified

---

4. Cover also moved for directed verdicts on counts 3, 4, and 5, for which he ultimately received acquittals. He did not move for directed verdicts on counts 6 and 7.

that he responded, "[Y]ou come at me again, you'll never see the boys and you're gone."

¶13 Cover also testified regarding the airsoft pistol incident. Cover explained that the shooting began as part of a family "Nerf gun war," with Cade and Cover teaming up against Ellie and Jared. Cover got tired and decided to quit the game, but Cade wanted to continue against Ellie and Jared. According to Cover, Cade "got his feelings hurt" when things got "a little out of hand," prompting Cade to get his airsoft pistol and begin using it on Jared and Ellie. While Cover thought it was "funny," Ellie was upset and insisted Cover take the airsoft pistol away from Cade. When he attempted to do so, Cover claimed that Cade "put two shots into [him], point-blank, in the chest," leaving welts. Cover said that Cade "knew he was going to get it." Cover told Cade to run, and Cade fled toward the basement stairs. Cover said he shot Cade while Cade was at the top of the stairs, hitting his legs twice. Ultimately, Cover acknowledged shooting Cade but asserted that it was "done in fun" and as a form of "discipline" to teach Cade "a lesson." Cover acknowledged that although he knew receiving a shot from an airsoft pistol was "painful," he still shot Cade, explaining, "It's called discipline. . . . [H]e needed to be reinforced of what he gave to us."

¶14 As relevant here, for count 2 (the airsoft pistol incident) and counts 3 and 4 (the baby goat incident), the district court proposed the following jury instruction as to the elements of child abuse, repeating that the jury could not convict unless they found beyond a reasonable doubt that

> 1. [Cover];
>
> 2. intentionally, knowingly, recklessly, or with criminal negligence;
>
> 3. inflicted physical injury upon a child; and
>
> 4. *that the defense of reasonable discipline does not apply*.

(Emphasis added.) Counsel, apart from wondering whether the mental-state language should mirror the special verdict form (discussed below), approved the elements instruction.

¶15    Counsel also approved the special verdict form for the child abuse charges. As to the mental state, the special verdict form for each child abuse count read,

> We also unanimously find the State has proven, beyond a reasonable doubt, that defendant acted with the following mental state (*check only one*):
>
>     \_\_\_\_ intentionally or knowingly
>
>     \_\_\_\_ recklessly
>
>     \_\_\_\_ with criminal negligence

The special verdict form for count 1 additionally asked the jury to indicate whether the crime occurred "before September 1, 2016" or "on or after September 1, 2016."

¶16    And Counsel approved this instruction on reasonable discipline as proposed by the court:

> You must decide whether the defense of "reasonable discipline" applies to Counts, 2, 3 and 4 in this case.
>
> Under that defense, a person is not guilty of Child Abuse if his conduct constitutes reasonable discipline or management of a child.
>
> The State has the burden to prove, beyond a reasonable doubt, that the defense of "reasonable discipline" does not apply to Counts 2, 3, and 4.

¶17    The jury found Cover guilty of child abuse for burning Jared's hand, for shooting Cade with the airsoft pistol, and guilty for the threat of violence against Ellie. He was acquitted on all

other counts. The guilty verdict for burning Jared's hand was later dismissed because it was time-barred as the jury had found the incident occurred prior to September 1, 2016.

ISSUE AND STANDARD OF REVIEW

¶18 Cover now appeals his conviction related to the airsoft incident, claiming that Counsel "provided ineffective assistance when he failed to object to the plainly erroneous jury instructions and special verdict form." "When a claim of ineffective assistance of counsel is raised for the first time on appeal, there is no lower court ruling to review and we must decide whether the defendant was deprived of the effective assistance of counsel as a matter of law." *State v. Perkins*, 2024 UT App 101, ¶ 11, 554 P.3d 363 (cleaned up).[5]

ANALYSIS

¶19 To establish an ineffective assistance of counsel claim, a defendant must meet the two-prong test established in *Strickland v. Washington*, 466 U.S. 668 (1984): "First, the defendant must show that counsel's performance was deficient. . . . Second, the defendant must show that the deficient performance prejudiced the defense." *Id.* at 687. "Because both prongs of the *Strickland* test must be met to establish ineffective assistance of counsel, we need not always address both prongs." *State v. Fleming*, 2019 UT App 181, ¶ 9, 454 P.3d 862 (cleaned up). The deficient performance prong requires a defendant to "show that counsel's representation

---

5. In his opening brief Cover made claims of plain error by the district court. He acknowledged in his reply brief the correctness of the State's assertion that those claims failed under the invited error doctrine, and we therefore consider those claims of error to be abandoned. And as is evident from the issues raised, Cover's appeal does not challenge his conviction for threatening Ellie.

fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688. "A court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," meaning that a defendant must overcome the presumption that counsel's action "might be considered sound trial strategy." *Id.* at 689 (cleaned up). And the prejudice prong requires a defendant to show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *State v. Gonzalez*, 2021 UT App 135, ¶ 8, 501 P.3d 1205 (cleaned up). "That is, the defendant's showing must undermine our confidence in the outcome." *Id.* (cleaned up).

¶20    Cover asserts Counsel was ineffective in three different respects. First, he claims that Counsel should not have approved the jury instruction that included the defense of reasonable discipline as an element of child abuse. Next, he claims that Counsel fell short in approving the special verdict form for the airsoft pistol incident because that form did not mention the State's burden to disprove the reasonable discipline defense. Lastly, Cover faults Counsel for approving the reasonable discipline defense instruction itself, arguing that the instruction was defective in not explaining the circumstances that the jury should assess in determining whether the discipline was reasonable. We address each argument in turn.

A.    Inclusion of Reasonable Discipline Defense as an Element

¶21    Cover contends that Counsel was ineffective for approving the jury instruction that listed among the elements of child abuse "that the defense of reasonable discipline does not apply." In other words, Cover complains that Counsel should have objected to the applicability of the reasonable discipline defense being incorrectly grouped with the elements of child abuse in the instruction. *See supra* ¶ 14.

¶22    As a threshold matter, there is no question that the affirmative defense of reasonable discipline is not an element of the crime of child abuse. "The reasonable discipline provisions in sections 76-5-109(8) and 76-2-401(1)(c) are affirmative defenses, not elements of the offense, and thus need only be addressed and negated by the prosecution *if* the defendant has presented evidence of such affirmative defense." *Bountiful City v. Baize*, 2021 UT 9, ¶ 37, 487 P.3d 71 (cleaned up). This means that reasonable discipline doesn't need to be addressed unless a defendant brings it up as a defense.

¶23    But that doesn't mean Counsel was deficient in allowing it to be included in the jury instruction in the manner it was here. After all, it is the *State's burden* to disprove an affirmative defense, just as it bears the burden of demonstrating all elements of a crime charged, beyond a reasonable doubt. *See State v. Dominguez*, 2019 UT App 116, ¶ 17, 447 P.3d 1224 ("It is fundamental that the State carries the burden of proving beyond a reasonable doubt each element of an offense, including the absence of an affirmative defense once the defense is put into issue." (cleaned up)). Thus, if anything, its inclusion aided Cover and hindered the prosecution. Indeed, Counsel may have welcomed the addition of the reasonable discipline language as a means to providing another reminder to the jury of the State's burden in the case.

¶24    Counsel could have reasonably determined that the additional inclusion of the State's burden to disprove the reasonable discipline defense within the child abuse elements instruction was advantageous. This approach underscored the full scope of the State's burden of proving beyond a reasonable doubt both the elements of child abuse and the inapplicability of the reasonable discipline defense. Conversely, if the child abuse instruction omitted the State's burden to disprove the defense, Counsel might have worried that the jury could prematurely conclude that the State had satisfied its burden for the charged crime without recognizing that disproving the reasonable

discipline affirmative defense beyond a reasonable doubt was also required.

¶25    Cover argues that including the reasonable discipline defense in the elements was prejudicial "because it very likely confused the jury." More specifically, he asserts that by "lumping the reasonable discipline defense together with the elements of the offense, the jury was not required to consider the two inquiries separately." This argument is unpersuasive. The mere fact that the reasonable discipline defense was repeated in the child abuse elements instruction in no way supports the conclusion that it caused the jury confusion for two reasons. First, the jury acquitted Cover on counts 3 and 4 (the charges related to the baby goat incident), and those instructions also featured the reasonable discipline defense as an element. If the jury convicted Cover on counts 1 and 2 only because it was confused by the inclusion of the reasonable discipline defense as an element in the corresponding instructions, then it would have been very unlikely to acquit him on the charges related to the baby goat incident.

¶26    Second, under a counterfactual analysis in which Counsel had objected to the inclusion of the reasonable discipline defense as an element, there is no likelihood of a better outcome for Cover. *See State v. Ellis*, 2018 UT 2, ¶ 42, 417 P.3d 86 ("Prejudice analysis is counterfactual. To decide whether a trial affected by error is reasonably likely to have turned out differently we have to consider a hypothetical—an alternative universe in which the trial went off without the error."). We are simply not persuaded that it made a difference whether the jury was instructed about the reasonable discipline defense in the elements section or in some other place in the instructions. What was essential is that the jury was properly instructed. Moreover, the jury was in fact also instructed on the State's burden to disprove the reasonable discipline defense in a separate instruction—the reasonable discipline instruction itself. To demonstrate prejudice, Cover "must show that there is a reasonable probability that but for the

alleged errors, the result of the proceeding would have been different." *State v. Haar*, 2021 UT App 109, ¶ 54, 500 P.3d 102 (cleaned up). He simply cannot do that here. Therefore, Cover fails to demonstrate a reasonable likelihood that the outcome would have been different had Counsel objected to the child abuse instruction and requested only a separate explanation of the State's burden to disprove the defense of reasonable discipline.

B.     Special Verdict Form

¶27    Next, Cover argues that Counsel was ineffective in approving the special verdict form for count 2 (the airsoft pistol incident) because that form did not repeat the State's burden to disprove the reasonable discipline defense. Cover insists that Counsel "should have adamantly demanded that the jury be required, in its decision tree, to consider whether the State had met its burden of disproving, beyond a reasonable doubt, the reasonable discipline defense" by ensuring that the special verdict form for the airsoft shooting incident referenced the affirmative defense of reasonable discipline. We are unpersuaded. Counsel's performance was not deficient, and Cover was not prejudiced in the event it was.

¶28    The jury was amply instructed on the State's burden to disprove Cover's reasonable discipline defense beyond a reasonable doubt, both in the elements instruction and the reasonable discipline instruction. There is no disagreement that the jury received accurate instructions regarding the elements of child abuse (even though the reasonable discipline defense was incorrectly grouped with the elements) and the State's burden to disprove the defense. Cover's sole complaint is that the jury was not reminded of the State's burden on the special verdict form for a third time. Because the State's burden was clearly outlined in the instructions provided, Counsel could reasonably determine that this was sufficient. Moreover, Counsel could reasonably conclude that objecting to the omission of this repetition in the

special verdict form would be unnecessary and unlikely to succeed. And as is well-established, "a futile objection necessarily fails both the deficiency and prejudice prongs of the *Strickland* analysis because it is not unreasonable for counsel to choose not to make an objection that would not have been granted, and forgoing such an objection does not prejudice the outcome." *State v. Soto*, 2022 UT App 107, ¶ 31, 518 P.3d 157 (cleaned up). Cover thus fails to prove deficient performance and prejudice.

¶29    This claim of ineffective assistance additionally fails for lack of demonstrated prejudice under a counterfactual analysis. Even if Counsel had objected to the special verdict form, and such objection had been sustained and the form amended, there is no reasonable probability that the outcome would have been different. As previously noted, when the jury is correctly instructed on the elements of the crime and the State's burden to disprove any affirmative defense beyond a reasonable doubt, it does not matter whether this burden is reiterated in a specific instruction, including the special verdict form. Here, the jury was explicitly instructed on the State's burden to disprove the reasonable discipline defense in both the child abuse and the reasonable discipline instructions. And we presume the jury followed the instructions. *State v. Nelson*, 2011 UT App 107, ¶ 4, 253 P.3d 1094. Therefore, Cover fails to demonstrate a reasonable probability of a different outcome had the State's burden been repeated a third time in the special verdict form.

C.    Reasonable Discipline Instruction

¶30    Cover also faults Counsel for approving the reasonable discipline defense instruction, *see supra* ¶ 16, arguing that the "instruction did not provide any explanation as to the 'relevant circumstances' that the Utah Supreme Court" requires to be examined in assessing whether discipline was reasonable. Quoting *Bountiful City v. Baize*, 2021 UT 9, 487 P.3d 71, Cover asserts that the instruction should have directed the jury to (1)

"examine situations as a whole," (2) "take into account the various circumstances of the particular case," (3) consider "the relationship between the need and the amount and type of punishment administered," and (4) consider "the child's age and size." *Id.* ¶¶ 58–60 (cleaned up). From his reading of *Baize*, Cover insists that Counsel was ineffective in approving this instruction—given its "obvious deficiencies in failing to educate the jury as to the contours of the reasonable discipline defense."

¶31 Cover reads too much into *Baize*. First, *Baize* involved a bench trial, and so it obviously did not involve the "contours" of a defense in context of jury instructions. *Id.* ¶ 2. Second, *Baize* rejected the "contention that Utah courts *must* consider certain factors in making a reasonable discipline determination." *Id.* ¶ 58. Indeed, in identifying the circumstances that Cover lists, the Utah Supreme Court stated that it was providing "some useful guidance" extracted from various cases that might guide reasonable discipline determinations. *Id.* In no way did the court purport to establish a rigid four-factor test that trial courts must always incorporate into jury instructions as Cover suggests. Given these circumstances, Counsel could have reasonably concluded that the guidance given in *Baize* was adequately covered in other instructions. For example, the instruction for count 2 told the jury to "carefully consider all the evidence in this case." And the instruction on evidence told the jury that in "reaching a verdict," it was to "consider all the evidence." Thus, we see no deficient performance by Counsel given that the "instructions taken as a whole fairly instruct the jury on the law applicable to the case." *See State v. Beckering*, 2015 UT App 53, ¶ 27, 346 P.3d 672 (cleaned up).

¶32 We also fail to see how Cover was prejudiced by the absence of a *Baize*-like addition to the reasonable discipline instruction. Other than the circular assertion that "the jury did not consider these considerations because they were never informed as to what the considerations" were, Cover doesn't specifically

articulate how he was harmed by this alleged error. In any case, as we just pointed out, the jury was in fact explicitly told to carefully consider all the evidence in the case. Cover has offered no reason for us to conclude that the jury did anything other than what it was instructed, and Counsel was free to highlight any considerations on which he felt the jury should focus. Accordingly, this claim of error also fails on prejudice grounds.

## CONCLUSION

¶33    Cover has not borne his burden of demonstrating that Counsel rendered constitutionally ineffective assistance in any of the particulars he advances. Affirmed.

———————